

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-007-CR

JEWELL LYNN MADDEN                                                    APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

A jury convicted Appellant Jewell Lynn Madden of four counts of aggravated sexual assault of a child and three counts of indecency with a child by contact. The jury found the enhancement allegations to be true, and the trial court imposed concurrent life sentences for the aggravated sexual assault counts and sixty-year sentences for the indecency counts, to be served

---

[1] See Tex. R. App. P. 47.4.

consecutively to the sentences for the aggravated sexual assaults but concurrently with each other. Appellant brings three points on appeal, arguing that the trial court erred by denying his motion for mistrial, by admitting hearsay testimony, and by violating his constitutional double jeopardy protections. Because the trial court committed no reversible error, we affirm the trial court's judgment.

## Hearsay Testimony

In his second point, Appellant contends that the trial court erred by admitting out of court statements that the complainant made to her physical education teacher, Pauletha Amos. Amos testified that the complainant had told her that Appellant made her watch "adult movies with females doing nasty things to males and males doing nasty things to females" and that he touched her private area and made her touch him. The State offered the testimony not as an outcry statement but as an excited utterance. Amos testified that other students told her that the complainant was upset and that she had been crying. Amos called the complainant over to the side and asked her what was going on "because she was not normal." Amos testified that the complainant was "upset, crying, rubbing her eyes. And other kids were around her comforting her." Amos testified that the complainant told her that something bad had happened to her, so Amos told her to go into Amos's office. They went into

2

the office, and the complainant began telling Amos that her mother's boyfriend had done "nasty things to her."

An excited utterance is an exception to the prohibition against hearsay evidence and is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."[2] For a statement to qualify as an excited utterance under rule of evidence 803(2), it must be the product of a startling event, made while the declarant was dominated by the emotion, excitement, fear, or pain of the event, and the statement must have related to the circumstances of the startling event.[3] It is well established that

> [t]he basis for the excited utterance exception is "a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for *reflection* necessary to the fabrication of a falsehood and the 'truth will come out.'" In other words, the statement is trustworthy because it represents an event speaking through the person rather than the person speaking about the event.
>
> In determining whether a hearsay statement is admissible as an excited utterance, the court may consider the time elapsed and whether the statement was in response to a question.[4]

---

[2] Tex. R. Evid. 803(2).

[3] *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992), *cert. denied*, 508 U.S. 963 (1993).

[4] *Zuliani v. State*, 97 S.W.3d 589, 595–96 (Tex. Crim. App. 2003) (citations omitted).

In *Hughes v. State*,[5] our sister court in Tyler rejected the State's contentions that a complainant's statements produced as a result of an interview were excited utterances:

> That some of a declarant's statements were in response to questions does not necessarily make them inadmissible under this exception to the hearsay rule. But it is an important factor in determining the spontaneity of the statement. [The *Hughes* court explained that both] Deputy Wellborn and Ms. Baggerly asked C.D.H. [the complainant in *Hughes*] questions calculated to elicit information about past events and activities. "Responses to this type of questioning are normally considered reflective narratives of past events" and hence lacking the spontaneity required to be admissible under this exception.

> . . . [T]he rule requires a determination (1) whether C.D.H.'s presence with Opal and Deputy Wellborn at Opal's interview was an occurrence startling enough to produce a state of nervous excitement which would render her statements made during two lengthy interrogations "spontaneous and unreflecting" and, if so, (2) whether the startling event continued to dominate the reflective powers of her mind during that period. Several circumstances argue against it here.

> C.D.H. was brought to the Grapeland Police Department to lend moral support for her younger cousin Opal while she talked to the investigators. Opal and C.D.H. had recently discussed their shared history as victims of sexual abuse. C.D.H. had assured Opal that if she had to turn her father in, she would not be left to suffer alone. She knew why she was going to be with Opal, and she knew what she was going to hear. It was undoubtedly stressful but should not have been startling or surprising. The two interviews were conducted in tandem. The length of the interviews is itself a circumstance arguing against unreflecting spontaneity.

---

[5] 128 S.W.3d 247 (Tex. App. — Tyler 2003, pet. ref'd).

4

The record indicates that both girls remained in the room throughout the interviews by both Deputy Wellborn and Ms. Baggerly. The investigators, in their testimony, did not recount unreflecting statements made by the complainant. Instead, they summarized what they described as a very detailed narrative that emerged over a protracted interrogation.

. . . .

Responding to the investigator's questions, C.D.H. narrated a painful personal history. But narrations, especially of this length, are inherently reflective, not spontaneous. As its name strongly suggests, the exception for excited utterances or spontaneous declarations was not developed to allow the introduction into evidence of extended narratives by crime victims, and certainly not summaries of those narratives as in the instant case. . . .

In this case, it is impossible to conclude that C.D.H.'s statements were made without opportunity for reflection or deliberation. We decline to further expand the excited utterance exception to include a summary distilled from a protracted interrogation.[6]

In the case before us, Amos took the complainant into her office sometime after December 12, 2006, and began to question her. She asked her what was going on. She asked her "what was nasty going on with her." The complainant recounted what she had seen in the movies. Then Amos asked her if Jennifer Camp, the complainant's classroom teacher, knew. The complainant replied that she had already spoken to Camp. Then Amos asked the complainant if she had spoken with the counselor, Wanda Campbell. The

---

[6] *Id.* at 253–54.

5

complainant replied that she had spoken with the counselor and that CPS was involved.

The record shows that CPS had received a referral from the complainant's school, and the police received it on December 5, 2006. Also on December 5, the complainant's mother went to the police department to discuss the accusation. The following day, CPS personnel told Appellant to move out of the house, and he left that day. He never moved back in.

The complainant also explained to Amos that she had gone to the doctor at Cook Children's Hospital, that she had had to lie on a table, and that the doctor had had to go between her legs. The examination took place on December 12, 2006. Amos said, in response to the prosecutor's question, that when the complainant was discussing the movies, she told Amos that Appellant had made her do those nasty things to him when her mom was not at home. Amos said the complainant was upset because her brothers were upset and because she could not tell anyone about what had happened—Appellant had told her that he would hurt her and her family if she told.

The circumstances in which the complainant told her story, as provided in the record, in no way indicate that she had lost "the capacity for reflection

necessary to the fabrication of a falsehood."[7]  Indeed, Amos's taking the complainant into her office and asking her to explain what had occurred and how she felt about it presupposes that the complainant would reflect on her answers before speaking.

Additionally, the record shows that Amos did not begin her separate interview with the complainant until after the complainant had discussed the events with her teacher, her counselor, representatives of CPS, and medical personnel at Cook Children's Hospital; had been examined by a doctor; and had participated in a taped CPS interview.

This was a statement made about an upsetting series of events, but the statement was not an excited utterance as contemplated by the rule.  The trial court erred by overruling Appellant's objection to the testimony.

The same evidence, however, was admitted elsewhere.  Both the complainant and the outcry witness, Camp, had testified in detail about the same matters, rendering the error in improperly admitting the hearsay testimony of Amos harmless.[8]  We overrule Appellant's second point.

---

[7] *McFarland*, 845 S.W.2d at 846.

[8] *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *Johnson v. State*, 803 S.W.2d 272, 291 (Tex. Crim. App. 1990), *cert. denied*, 501 U.S. 1259 (1991), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991); *see also Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App.), *cert. denied*, 528 U.S. 956 (1999); *Harris v. State*,

**Denial of Mistrial**

In his first point, Appellant complains that the trial court erred by denying his motion for mistrial, infringing on his rights to due process and the presumption of innocence. After a police officer had already testified without objection that Appellant had been arrested, the State asked the complainant's mother if she had visited Appellant in jail. Appellant objected that evidence of incarceration was not relevant and injected facts that had no probative value and that any probative value was substantially outweighed by the prejudicial effect. He also raised a rule 404(b) objection.

The prosecutor immediately withdrew the question. The trial court sustained Appellant's objection and instructed the jury to disregard the question. The trial court denied Appellant's motion for a mistrial. On appeal, Appellant argues that the prosecutor's informing the jury that Appellant had been incarcerated invades the presumption of innocence, relying on *Randle v. State*.[9] Appellant equates informing the jury of his incarceration with forcing him to stand trial before the jury in jail clothes.

When the trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for a mistrial, the issue is whether

133 S.W.3d 760, 772–73 (Tex. App.—Texarkana 2004, pet. ref'd).

[9] 826 S.W.2d 943, 945 (Tex. Crim. App. 1992).

the trial court abused its discretion by denying the mistrial.[10]  Only in extreme circumstances, when the prejudice caused by the improper argument is incurable, that is, "so prejudicial that expenditure of further time and expense would be wasteful and futile," will a mistrial be required.[11]  In determining whether the trial court abused its discretion in denying the mistrial, we balance three factors:  (1) the severity of the misconduct or prejudicial effect, (2) curative measures, and (3) the certainty of conviction absent the misconduct.[12]  The prosecutor immediately withdrew the question.  The trial court took quick action and sustained the objection and instructed the jury to disregard.  There is no indication in the record that the trial court's instruction to disregard was ineffective.  The question was not so prejudicial and inflammatory that the instruction could not cure the harm.  Additionally, as the State points out, similar evidence was admitted elsewhere without objection.  We therefore hold that the trial court did not err by overruling Appellant's motion for mistrial.  We overrule Appellant's first point.

---

[10] *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

[11] *Id.*; *see also Simpson v. State,* 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), *cert. denied*, 542 U.S. 905 (2004).

[12] *Hawkins,* 135 S.W.3d at 77; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

9

**Double Jeopardy**

In his third point, Appellant contends that his convictions for indecency violate his right to be free from double jeopardy. Appellant points out that although a person who commits more than one sexual assault against the same complainant may be convicted and punished for each separate act, even if the acts were committed in close temporal proximity,[13] the State may not engage in "stop-action" prosecutions.[14]

The question, then, is whether Appellant was prosecuted for seven distinct offenses, or four offenses and three lesser included offenses of those same offenses. Relying on *Ochoa v. State*,[15] in which the Texas Court of Criminal Appeals held that indecency with a child can be a lesser included offense of aggravated sexual assault, depending on the facts of the case, Appellant argues that the convictions for aggravated sexual assault charged in counts one through four and the convictions for indecency with a child by contact charged in counts five, six, and seven were based on the same acts and thus violated double jeopardy protections.

---

[13] *Vick v. State*, 991 S.W.2d 830, 833 (Tex. Crim. App. 1999).

[14] *Patterson v. State*, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004).

[15] 982 S.W.2d 904, 908 (Tex. Crim. App. 1998).

10

To determine whether both offenses are the same, we must examine the elements of the applicable statutes to determine whether each statute "requires proof of an additional fact which the other does not."[16] When resolving whether two offenses are the same for double jeopardy purposes, we focus on the elements alleged in the charging instrument.[17]

The indictment alleges that all the aggravated sexual assault counts occurred on or about December 5, 2006, and that all the indecency counts occurred on or about December 1, 2006. The complainant testified to repeated sexual acts against her and explained that they happened almost every day that her mom went to work. She also testified that Appellant placed his penis in her mouth every time he "messed with" her. She had to hold his penis with her hand or hands while it was in her mouth. The complainant testified that Appellant penetrated her female sexual organ with his finger and touched her genitals and anus with his penis. He continued to sexually assault her until the day before CPS came to her house.

---

[16] *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932); *see United States v. Dixon*, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856 (1993); *Parrish v. State*, 869 S.W.2d 352, 353–55 (Tex. Crim. App. 1994).

[17] *Bigon v. State*, 252 S.W.3d 360, 370 (Tex. Crim. App. 2008).

11

Although Camp and Amos mentioned touching, they were indefinite about what Appellant touched the complainant with and reported only that he had touched her private area.

The indecency offenses and the aggravated sexual assaults occurred over a long period of time on multiple days, but there is no evidence beyond speculation that Appellant committed separate and distinct offenses of indecency. The State has provided us a helpful chart, which we reproduce below:

| | |
|---|---|
| **Count 1— Aggravated Sexual Assault** | C.G. testified that Appellant ordered her to open her legs and then put his penis in her private part. RR 4:26. This hurt C.G. very badly. RR 4:27. C.G. testified that Appellant told her to check to see if she was bleeding . . . . RR 4:27. C.G. told [Crystal Utley, the nurse practitioner who examined her at Cook Children's Hospital] that Appellant's penis contacted her vagina. RR 5:78. |
| **Count 2— Aggravated Sexual Assault** | Once Appellant determined that she was not bleeding, Appellant ordered C.G. to flip over and lay on her stomach again. RR 4:27. Appellant stood up and placed his penis on her behind. RR 4:28. Appellant would place his penis on her bottom and in her privates. RR 4:31. C.G. testified that this made her private burn when she urinated. RR 4:31. |
| **Count 3— Aggravated Sexual Assault** | C.G. told Amos that Appellant was making her watch pornographic movies and that Appellant made her do those nasty things to [him] when her mom was not home. RR 4:87. Appellant would touch her in her private area and made C.G. touch him on his privates. RR 4:88. |

| | |
|---|---|
| **Count 4— Aggravated Sexual Assault** | C.G. testified that Appellant placed his penis in C.G.'s mouth and pushed her head back and forth. RR 4:25–26. C.G. also testified that Appellant put his penis in her mouth and "peed" in her mouth. RR 4:30. C.G. swallowed it one time and her stomach began to hurt. RR 4:30–31. |
| **Count 5— Indecency with a Child** | Camp testified that C.G. told her that Appellant would touch her down there—which Camp took to mean in a sexual manner. RR 4:69–70. C.G. testified that in addition to Appellant placing his penis in her privates, Appellant would insert his finger in her privates. RR 4:38–39. |
| **Count 6— Indecency with a Child** | C.G. testified that Appellant would touch her in her behind. RR 4:37. |
| **Count 7— Indecency with a Child** | C.G. testified that she would hold Appellant's penis. RR 4:38. C.G. testified that "(w)henever he put it in (my) mouth, he told me I have to hold it." RR 4:38. C.G. said that she would hold it with her hands. RR 4:38. |

We hold that the evidence does not show that the four aggravated sexual assault offenses alleged in the indictment are totally separate and apart from the three indecency by contact charges alleged in the indictment. The question arises, then, whether the State may plead the lesser included offenses when the evidence shows repeated commission of the greater offenses. Although the evidence shows only the greater offenses, occurring repeatedly, the greater offenses were described by the complainant in detail that included the lesser offenses of indecency. Based on our review of the record, we hold that the record sufficiently describes more than seven separate and discrete events during which Appellant sexually assaulted the complainant. We also recognize

13

that nothing in the statutes governing indictments prevents the State from indicting a person for a lesser offense than one supported by the proof.[18] Finally, we hold that because the evidence reflects more than seven instances of aggravated sexual assault that included the elements of the lesser offense of indecency, there was no double jeopardy violation.[19] We therefore overrule Appellant's third point.

## Conclusion

Having overruled Appellant's three points, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  CAYCE, C.J.; LIVINGSTON and DAUPHINOT, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  September 3, 2009

---

[18] *See* Tex. Code Crim. Proc. Ann. art. 21.01–.31 (Vernon 2009).

[19] *See Medcalf v. State*, No. 02-07-00366-CR, 2008 WL 4926025, at *2–3 (Tex. App.—Fort Worth Nov. 13, 2008, pet. ref'd) (mem. op., not designated for publication); *Bottenfield v. State*, 77 S.W.3d 349, 358 (Tex. App.—Fort Worth 2002, pet. ref'd), *cert. denied*, 539 U.S. 916 (2003); *Hutchins v. State*, 992 S.W.2d 629, 633 (Tex. App.—Austin 1999, pet. ref'd, untimely filed).

14